# SMITH & KING LLC

www.SmithandKinglaw.com

LONG ISLAND OFFICE:
666 OLD COUNTRY ROAD
SUITE 305
GARDEN CITY, N.Y. 11530
Telephone: (516) 213-0018
Fax: (917) 591-3244
_____

David S. Smith, Esq.†
Brian King, Esq.*
†Admitted in New York and California
*Admitted in New York and Connecticut

NEW YORK CITY OFFICE:*
900 THIRD AVENUE, 13TH FLOOR
NEW YORK, N.Y. 10022
Telephone: (212) 681-2800
Fax: (917) 591-3244
*Please send all mail to the Garden City Office

August 29, 2019

Honorable Joanna Seybert
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722-9014

   Re:  United States v. Jeffrey Chartier, et al – Case No. 17 CR 372

Your Honor:

## I.  Introduction

  In anticipation of Defendant Ronald Hardy's sentencing on September 12, 2019, we respectfully submit this letter in support of our request that the Court impose a sentence no greater than five years' imprisonment, three years supervised release, forfeiture and restitution, no fine, and a special assessment. On August 22, 2018, Mr. Hardy pled guilty before Your Honor, without a written plea agreement, to Counts 1 through 3 and 5 through 9 of a nine-count Indictment.[1]

  Those charges are based on his involvement in a scheme to inflate fraudulently the price of certain securities, resulting in illegal profits, which were laundered to him and his co-conspirators, and significant losses to investors. The Presentence Report ("PSR") calculates Mr. Hardy's total offense level to be 43 [Id. at ¶127] and Criminal History Category ("CHC") as a level III [Id. at ¶67], resulting in a Guideline sentencing range of life imprisonment.[2]

---

[1] Unable to reach a plea agreement with the Government, Mr. Hardy nevertheless entered this plea to timely accept responsibility for his criminal conduct, resolve all criminal liability under the instant indictment, avoid wasting the Court's time and resources with unnecessary litigation, and to begin the process of bringing closure to the victims and his family. Mr. Hardy was not named in Count 4 of the Indictment.

[2] The Probation Department has not yet issued the final version of the PSR but has indicated it will do so soon. Because Mr. Hardy's sentencing is fast approaching, we wanted to submit our sentencing memorandum now, so the Court had sufficient time to review it and the Government has a fair opportunity to respond to it. Given that some aspects of the PSR may change with its final version, we reserve the right to supplement this submission and/or alter our positions in it after receiving a copy of the final PSR.

Even though Probation and the Government have both disregarded that range as an appropriate sentence, and Probation has recommended a sentence of 10 years imprisonment, we set forth our objections to Probation's Guideline calculations below to preserve those issues.[3] Mr. Hardy also moves for a downward departure of his CHC because a level III overstates the seriousness of his criminal history and likelihood of him committing a crime in the future.

We agree with Probation and the Government that a non-Guideline sentence is appropriate for Ron, but respectfully submit that a sentence no greater than five years' imprisonment provides sufficient punishment and deterrence. It also accounts for his childhood trauma, lack of guidance as a youth, admirable achievements, acceptance of responsibility, post-offense rehabilitation, and extraordinary family responsibilities. Without intending to diminish the significance of Ron's criminal conduct in any way, we will expand upon the foregoing considerations in the following sections of this letter with the hope that our presentation will lead the Court to share our belief that our requested sentence is appropriate.

## II.    Personal Background

Ronald Hardy was born on April 10, 1975, as the only child of Ronald Edward Hardy, Sr. and Catherine Ragin in New York, New York. PSR ¶138. He has a paternal half-sister but has never had any contact with her. His parents were not married when he was born and had a tenuous relationship at the time. His mother was only 18 years old when she gave birth to him and was unemployed, had no money, and was completely unprepared for a child. His father was also poor and wanted little to do with Ron and Catherine. As a result, Ron grew up in poverty as child, with his mother relying on food stamp benefits to provide him the bare necessities. Id. at ¶139. Ron recalls skipping meals when there was no food in his home and his mother obtaining his clothes from thrift shops and the Salvation Army.

Desperate for relief from her struggles, Ron's mother became a devout Jehovah's Witness with an extremist interpretation of the religion that she applied to all facets of her life. His father did not share his mother's religious beliefs which led to their separation when Ron was only two years old. He thereafter played no part in Ron's childhood, never contacting him or providing any financial support. Id. Ron's life alone with his mother then became tortuous for many years. Based on her religious beliefs, she forbade him from associating with his peers who did not follow the same religion, participating in birthday parties, and enjoying any activities not affiliated with the church. Id. She attempted to convince Ron that people who were not Jehovah Witnesses were "devils" and forced him to attend church several times a week and to read the bible every day, whether he wanted to do so or not.

From a young age, Ron knew his mother's views were not healthy and that her parenting style was oppressive. He frequently expressed his desire to participate in typical social activities with his classmates, which enraged his mother. Id. at ¶140. She attempted to gain his submission to her will by physically abusing him on a daily basis for several years. Id. When she eventually realized her demented tactics were unsuccessful, she abandoned Ron when he was only 16 years old. He returned home from school one day to find that his mother had placed his belongings outside of their apartment and changed the locks so he could not get inside. Id. When he knocked on the door, his mother told him that he was "the son of the Devil" and that he

---

[3] We have spoken with the Government and understand that it will not be seeking a Guideline sentence.

was no longer welcome to reside with her.  Id.  For the next month, at the vulnerable age of 16, Ron lived on streets, sleeping on a park bench in Central Park.  Id.  He begged for money and food and lived in constant fear for his safety.

When Ron's maternal aunt learned of his circumstances, she wanted to help him but could not afford to have him live with her.  As an alternative, she secured placement for him in a shelter for homeless youths in Brooklyn.  Id.  Ron contacted his mother a few months later in the hopes of returning home but she rejected him again, declaring she no longer considered him her son.  Id.  He never spoke to her again and realized he needed to build his life all by himself.

At first, Ron felt tremendous despair.  He began drinking alcohol and smoking marijuana on a regular basis as a way to self-medicate his sadness and pain.  Unfortunately, that coping mechanism continued for a long time, which later contributed to his poor decisions in the future.  Even though Ron had every reason to give up on life, he summoned the strength to move forward.  He started working as a store clerk at a grocery store and rededicated himself to his schoolwork, graduating from Park West High School in 1994.

Immediately after high school, Ron's friend helped him get a job as an assistant broker at a broker-dealer.  With no direction, guidance or support, but eager to find acceptance and success, Ron felt blessed to have full-time employment and be around dynamic people who, for the first time in his life, appeared to care for him and gave him a chance to be successful.  Unfortunately, that broker-dealer was Stratton Oakmont, which was filled with unscrupulous brokers who set a bad example for Ron at such an impressionable time in his life.  Being only 18 years old, abandoned by his parents, homeless, and self-medicating with drugs and alcohol, what Ron desperately needed was an adult figure to show him the proper and ethical way to live and conduct business.  Sadly, Ron received the wrong kind of mentorship, as many of his superiors valued the firm's profits over following the rules.  Young, immature, and desperate, Ron was so eager to succeed and please his superiors that their behavior rubbed off on him.  That formative time instilled bad habits and poor ethical standards in Ron that lasted the rest of his career.

Ron did work hard, however, and did not start his career with an intent to harm any clients.  To the contrary, he made sincere, long-standing efforts to achieve legitimate success.  He started on that path by studying for and obtaining his Series 7 and 63 licenses in March 1996.  He then worked as a registered representative at Continental Broker Dealers for seven years followed by Solomon Gray Financial for three years.  His close friend, Wil Satterthwaite, witnessed Ron's efforts to build a worthwhile career during that time.  In his letter to the Court, annexed hereto as Exhibit A, he shares those memories, writing,

> I recall early on in our friendship, Ron's quest to be successful led to spend[ing] many nights in his office.  This allowed him to work late and begin work the next day bright and early.  His work ethic was unmatched and he quickly became a benchmark that represented dedication and hard work.

In addition to achieving professional success, Ron also displayed an eagerness to do good in other aspects on his life.  One of them was partnering with his friend Tamia Santana to produce dance concerts at local venues.  Ron wanted to support arts and culture in his community and took pride in helping those causes when he could.  In her letter to the Court, Ms. Santana professes that "He was level-headed and fair with agreements and negotiations that we

had with clients" and "He has always treated customers and partners fairly in every aspect of that business." Exhibit B.

During that time, Ron also developed many long-standing friendships. One of them was with Delroy Crosswell, Jr. who has been friends with Ron for over 20 years. Through those many years, Delroy has gotten to know Ron well. In his letter to the Court, he praises Ron's dependability and compassion, declaring, "If you ever need help[,] he is there for you. If you ever need someone to listen to you[,] he is there." Exhibit C.

Ron's friends were not the only ones who appreciated his admirable qualities. In 2001, he started dating Karla Beatrice who quickly developed strong feelings for him. He treated her with great care and kindness, which she reciprocated as the two grew closer. Before long, they fell in love and were married on December 30, 2004 in the Bahamas and on January 14, 2005, in Islip, New York.

They settled in Port Jefferson and have two children together – a son, now 13 years old, and, and a daughter, now 9 years old. Ron has given his children the love and support that he never received from his parents. He has taken an active role in their lives, taught them important morals and values, and provided them a safe and healthy environment in which to grow up. During her interview with the Probation Department, Karla expressed her appreciation for Ron, describing him as "a helpful, honest, hard-working, strong, and tough individual who will help anyone in need, and as a devoted father." PSR ¶142

Ron's dedication to his family has been obvious not just to Karla but to their close friends as well. "I have had the distinct pleasure of observing Mr. Hardy with his children," writes his long-time friend, Nadine Satterwaite. Exhibit D, p. 1. She goes on in her letter to confirm, "They admire and love him without reservation. Mr. Hardy is a hands[-]on father and a very responsible family man." Id. In a separate letter to the Court, Felipe Torres explains why he has sought to emulate Ron's relationship with his wife and children:

> As a [f]ather, Ron has been a source of inspiration and a role model. I see how active and attentive Ron is with his children and wife; he's always involved in their school and sports activities. His compassion and patience to listen and address their curiosity of life has been a blueprint for me.

Exhibit E.

Despite Ron's many admirable qualities, he still struggled with great personal pain. In 2002, his mother was found dead in her apartment. She was only 45 years old and had succumbed to complications from severe hypertension. PSR ¶138. She was an alcoholic, had not been following her medication regimen, and overheated in her apartment. Id. Ron had not spoken to her in years and the news of her passing came as a painful shock. He never had a chance to face her as an adult to discuss the trauma she inflicted upon him as a child.

To repress his pain, Ron, like his mother, often turned to alcohol. His drinking progressed from a social habit to a serious problem. He also abused marijuana and occasionally

4

used cocaine. His drug and alcohol use impaired his judgment to such a degree that he was twice convicted of driving while intoxicated, the first time in 2006 and again in 2010.

His professional judgment also suffered during that time. On September 2, 2009, the SEC barred him from associating with any broker or dealer pursuant to Section 15(b)(6) of the Exchange Act as a result of his misconduct while employed at Aura Financial Services. He was held responsible for making untrue statements of material facts to some of the firm's clients and engaging in unauthorized trades. He accepted responsibility for his misdeeds and walked away from the securities industry.

With no other job prospects on the horizon, he opened a bar in Hempstead called Agua Dulce. It was financially successful for three years, but the hours he had to work interfered greatly with his family time. At that time, he and his wife had a new baby and their son who was only four years old. Given his experience with abandonment and his love for his children, Ron would not accept being absent from their lives. As a result, he sold the bar and began looking for other employment.

### III. Offense Conduct

Because Ron did not have a college degree and his only meaningful qualifications and work experience were working for broker/dealers, his employment options outside that field were limited. At the time, the securities industry was the only field in which he was qualified to work that offered regular daytime work hours with sufficient pay, so he could spend time with his family and provide them enough financial support. Faced with those realities, he accepted a job to work at Elite Stock Research ("ESR"), which was controlled by other of Ron's Co-Defendants. The company's purported purpose was to sell a subscription service through which it provided potential investors with research and information regarding companies that hired ESR to promote it. Ron worked as a cold caller there from January 2014 to June 2014.

ESR is the place where Ron's offense conduct began. He started the job with good intentions but quickly surrendered to the unhealthy and corrupt culture that was already in place at ESR. He joined his co-workers in abusing drugs and alcohol in their personal time and flouting the rules at work. His complicit approach soon led to him participating in the criminal conspiracy that has now brought him before this Court.

It should be noted that scheme began well before Ron made the mistake of joining it by beginning to work at ESR. Specifically, it appears to have started when other defendants orchestrated and led the acquisition of large amounts of shares in certain microcap companies. Those defendants then hired ESR to fraudulently inflate, aka "pump," the share price of those companies to increase the value of their holdings. They paid ESR in cash and shares in the microcap companies and the Defendants at ESR then inflated the share price of those companies by executing trades between nominee accounts where there was no true transfer of ownership, aka wash trades, and selling their own shares to the investors, aka matched trading. They convinced investors to buy those shares through high-pressure sales tactics and material misrepresentations and omissions about the soundness of the investments. Once those shares were falsely inflated to a certain level, the orchestrators and the Defendants at ESR sold their shares to capture their profits. Their selloff caused the prices of those stocks to decline, resulting in significant losses to investors. After joining ESR, Ron knowingly participated in this ongoing

5

scheme by working as a cold caller and account executive, convincing investors to purchase the manipulated stocks based on false information and without informing them of scheme's criminal purpose.

In July 2014, Ron and Co-Defendant Erik Martz decided to leave ESR and start a new company, which went through several names such as Power Traders Press and Trade Masters Pro, but will be referred to as PTP for purposes of this memorandum. They recruited some of the team at ESR to join them at PTP, where they continued the same misconduct. At PTP, Ron participated in the ongoing scheme primarily as a manager of cold callers and account executives. He also tracked the finances of PTP and laundered a significant amount of the criminal proceeds to himself and Erick Matz, as well as others.

### IV.     Post Offense and Present Circumstances

Ron has accepted responsibility for his crimes by pleading guilty in this case and leaving his future in the hands of the Court. He offers no excuses for his misconduct and feels terrible for the harm he caused so many people. In her letter to the Court, Ron's friend Kaleena Pursoo confirms his sincere contrition, as she shares, "In talking to Ron[,] I truly do get a sense of remorse for his wrongdoing." Exhibit F, p. 1. She also attests to his determination to move forward in a positive direction:

> He is not allowing the current circumstances to defeat him and that again proves the strength of his character not only for himself but for his family. His making amends by making a more honest living for himself and mostly importantly for his family.

Id. at p. 2. Ron's friend Nadine Satterwaite shares a similar opinion of Ron in her letter to the Court, as she writes, "Mr. Hardy is a good person who made bad choices however, he has the ability to rebound and become a productive member of society." Exhibit D, p. 1-2

Ron has demonstrated his ability to do so by maintaining meaningful employment following his arrest. As referenced in the PSR, Ron worked as a manager at Exclusive Auto Repair from July 2017 to October 2017. He performed well there and left that job only because his employer offered him a higher paying position in his contracting business, R&R Construction. Ron has been employed as a manager there since November 2017. His boss, Tristan Robles, has written a letter to the Court, praising Ron's contribution to his company:

> Ron has also done wonders for my business. He works hard EVERYDAY, keeps my men in line, as well as happy and motivated. Treats them fairly and keeps my customers happy. I couldn't ask for a better manager.

Exhibit G.

In addition to his work efforts, Ron has rededicated himself to his family. During the course of the offense, Ron and his wife had grown apart and been unfaithful to one another. Instead of allowing this case to divide them further, Ron has used it as a catalyst for their reconciliation. His wife discusses that process in her letter to the Court:

6

> He continues to wake-up each day and work hard to provide us with a roof over our heads and food on the table and go on with life as normal as possible for the sake of this family even though we don't know what the outcome of the case will be. I know that our marriage faced difficult challenges when this indictment was filed but we have been able to work through our issues and be supportive to one other and our marriage has grown stronger.

Exhibit H, pp. 1-2.

In the wake of his arrest, Ron has taken a hard look at himself and acknowledged his wrongdoing in this case, his marriage, and his life. He realizes that he created distance from his wife because he was afraid to be vulnerable. The trauma he endured as a child created a fear of abandonment, hindered his ability to trust anyone, and shielded him from feeling his own pain and the pain he caused others to suffer. He always kept his guard up and had difficulty communicating with his wife. Instead of relying on her, he mistakenly thought that money and success could provide him the security he never had as a child. His pursuit of those rewards overshadowed his personal and professional ethics and sense of morality. He now sees the roots of his disordered thinking and poor behavior. He is committed to addressing those issues and making positive changes. In a strange way, he is thankful that this case has broken a negative cycle that has plagued him for so many years and has given him an opportunity to reflect upon his life, evaluate his poor decisions, and learn from them. He knows that he will be going to prison and fully intends on using that time productively to become a better person for the sake of himself, his family, and society.

With those important lessons in mind, Ron has spent significant time trying to help inner city youths who are enduring similar struggles. About 10 months ago, his friend Michael Smith, who has worked with non-profit organizations that aim to lift and empower young people, offered him an opportunity to work with kids and young adults who have experienced homelessness and are struggling to find work and stability in their lives. In his letter to the Court, annexed hereto as Exhibit I, Mr. Smith recounts Ron's amazing response to his offer:

> Without hesitation, Mr. Hardy said he'd love the opportunity to share his story, his life experiences and his skills. Since that day[,] about twice a month[,] Mr. Hardy has facilitated several workshops to assist young people to realize their passion and purpose. Mr. Hardy has been extremely affective with our students that have been influenced by gang culture and headed down the wrong path. Mr. Hardy shared his current situation with our young people and the inevitable results of choosing the wrong path and the impact it has on not only himself but his community and most importantly his loved ones. Mr. Hardy has been very instrumental in helping my young people to choose differently. He has helped them see what's possible for themselves. Many of my students have come to me and expressed gratitude for having him as part of our family. In my opinion [,] Mr. Hardy has been a blessing to these young people and would love for him to continue working with our students. He has so much to offer I'm glad our paths crossed. Mr. Hardy is without question a benefit to the community and is redeemable.

7

Despite his post offense rehabilitation and path of redemption, Ron cannot erase the grave mistakes and criminal decisions he has already made or the damage his misconduct has caused and will continue to cause others. Ron has read the statements of the victims in the PSR and feels terrible for the harm he has caused them. It is his intention to work when he gets out of prison to repay his victims whatever he can and try to lessen the financial hardships they have suffered. He also understands he has caused them emotional distress that may last for a long time.

His offense conduct, as well as the punishment for it, has harmed, and will continue to harm, his wife and two young children. Being 13 and 9 years old, his children are at critical stages in their lives when they truly need their father's presence, guidance, and support. From an emotional perspective, they will be fully aware of his absence when he goes to prison and will have to wrestle feelings of sadness, abandonment, shame, and anger as they learn of the reasons why he is gone. They will suffer financially as well because Ron has been the sole financial provider of the household up until his arrest. His wife had not worked in many years and only recently obtained employment as a teacher's aide, earning $300 a week. As paragraph 164 of the PSR reflects, Ron and Karla have close to $1 million in debt and monthly expenses totaling $6,145. In her letter to the Court, Karla describes her frightening reality of surviving without Ron:

> Unfortunately, with my husband not being here potentially I don't see myself continuing to stay in this house. I will not be able to support our family with my income and be able to keep up with the house bills if Ron goes away, not having his support, it will be difficult transition.

Exhibit H, p. 2. Ron's friend of 25 years, Shawn Santana, shares similar concerns in his letter:

> In my 25 year observation, Ron works tirelessly to provide for his wife and two children to give them the life that he never had growing up. His wife relies on his income to take care of his family. Without Ron's financial support, I am deeply concerned that his wife and children will suffer tremendously.

Exhibit J.

While Ron knows that he must be punished for his crimes, and that he has no one but himself to blame, he respectfully asks that when considering how long he must go to prison, the Court take into consideration his desire to make restitution to his victims and family's circumstances as well. He also respectfully asks the Court to take into account his traumatic childhood, lack of guidance as a youth, minimal criminal history, years of legitimate professional success, sincere contrition, and post offense rehabilitation.

### V. **Guidelines Calculation**

#### A. **Objections to Probation's Guideline Calculations**

Unfortunately, those factors are not taken into consideration in determining his Guideline sentencing range. Instead, that calculation is largely driven by the loss amount, which the Probation Department has determined to be $114,727,270. PSR ¶¶95, 102. Notably, that figure

is not the actual loss of the victims in this case, which was nearly $100 million less, but is calculated using the market-based theory of loss equal to the amount each stock that was falsely inflated multiplied by the number outstanding shares in those companies.  Id.  That figure causes a 24-level increase in Probation's calculation, leading to Ron's total offense level being 43.  Id. at ¶127.  With his criminal history category being III [Id. at ¶133], those estimates result in a Guideline sentencing range of life imprisonment.

Without intending to minimize the seriousness of Ron's offense conduct, nor the harm it caused, we respectfully submit that these Guidelines result in an advisory sentence that is far beyond what is reasonable and necessary to achieve the ends of justice.  Indeed, even the Probation Department agrees and is requesting a sentence far below that range – 10 years imprisonment.  Accordingly, we respectfully submit that the Guidelines are not a useful tool in determining a fair and just sentence for Ron.  Nevertheless, we are mindful that the Court must consider them and, accordingly, we must levy Ron's objections to the Probation's calculations that we believe are incorrect.

His first objection is to the four-level enhancement under U.S.S.G. §2B1.1(b)(20)(A), which is triggered when a defendant violates a securities law when he or she was a registered broker or dealer or a person associated with a broker or dealer.  Id. at ¶¶88, 106.  Plainly, however, none of those conditions apply to Ron.  He was not a registered broker or dealer at the time of the offense, nor was he associated with a registered broker or dealer, as the companies he worked for at the time of the offense - ESR and PTP - were unregistered stock promotion companies.

Ron also disagrees with Probation that a two-level enhancement under U.S.S.G. §2S1.1(b)(2)(B) is warranted.  Id. at ¶¶96, 112.  In general, that enhancement applies when a defendant is convicted under 18 U.S.C. §1956.  Id.  Application Note 3(C) to that Guideline creates an exception to that rule, however, where a defendant is convicted of a conspiracy to commit money laundering under §1956(h) and the sole object of that conspiracy was to commit an offense under §1957.  Ron's conviction falls directly within that exception, so that enhancement should not apply.

That enhancement is also a prerequisite for the application of a two-level enhancement under U.S.S.G. §2S1.1(b)(3) for the sophisticated laundering of money.  Because the enhancement under (b)(2)(B) does not apply, neither does the one under (b)(3).  As such, Probation's inclusion of it is improper.  Id. at ¶¶96, 113.

### B.    Mr. Hardy's Proposed Guideline Calculations

With those objections in mind, Ron respectfully submits that the following Guideline calculation is the correct one.  When a defendant pleads guilty to multiple counts, section 1B1.1(a) instructs courts to determine the base offense level, apply offense characteristics, and apply the adjustments from parts A, B, and C from Chapter 3 for every count of conviction.  It then directs courts to perform a grouping analysis, pursuant to part D of Chapter 3, apply acceptance of responsibility points, determine the criminal history category ("CHC"), and apply other adjustments from part B of Chapter 4.  That information will yield a total offense level and CHC to be applied to the sentencing table, which will produce a Guideline sentencing range.  A correct application of those rules to Ron's case results in the following calculations:

9

**Count One – Conspiracy to Commit Securities Fraud**

| | |
|---|---|
| U.S.S.G. §§2X1.1(a) and 2B1.1(a)(1) – base offense level - | 7 |
| U.S.S.G. §2B1.1(b)(1)(M) – loss of at least $65 million but not greater than 150 million - | + 24 |
| U.S.S.G. §2B1.1(b)(9)(C) – substantial financial hardship to at least 5 but not more than 25 victims - | + 4 |
| U.S.S.G. §2B1.1(b)(9)(C) – committing offense after a SEC debarment - | +2 |
| U.S.S.G. §2B1.1(b)(10)(C) - sophisticated means - | +2 |
| U.S.S.G. §3B1.1(b) – managerial role - | +3 |
| Count One Offense Level = | 42 |

**Count Two – Conspiracy to Commit Wire Fraud**

| | |
|---|---|
| U.S.S.G. §§2X1.1(a) and 2B1.1(a)(1) – base offense level - | 7 |
| U.S.S.G. §2B1.1(b)(1)(M) – loss of at least $65 million but not greater than 150 million - | + 24 |
| U.S.S.G. §2B1.1(b)(9)(C) – substantial financial hardship to at least 5 but not more than 25 victims - | + 4 |
| U.S.S.G. §2B1.1(b)(9)(C) – committing offense after a SEC debarment - | +2 |
| U.S.S.G. §2B1.1(b)(10)(C) - sophisticated means - | +2 |
| U.S.S.G. §3B1.1(b) – managerial role - | +3 |
| Count Two Offense Level = | 42 |

**Count Three – Securities Fraud – NWMH stock scheme**

| | |
|---|---|
| U.S.S.G. §2B1.1(a)(1) – base offense level - | 7 |
| U.S.S.G. §2B1.1(b)(1)(M) – loss of at least $65 million but not greater than 150 million - | + 24 |
| U.S.S.G. §2B1.1(b)(9)(C) – substantial financial hardship to at least 5 but not more than 25 victims - | + 4 |
| U.S.S.G. §2B1.1(b)(9)(C) – committing offense after a SEC debarment - | +2 |
| U.S.S.G. §2B1.1(b)(10)(C) - sophisticated means - | +2 |
| U.S.S.G. §3B1.1(b) – managerial role - | +3 |
| Count Three Offense Level = | 42 |

**Count Five – Securities Fraud – 2015 CESX stock scheme**

| | |
|---|---|
| U.S.S.G. §2B1.1(a)(1) – base offense level - | 7 |
| U.S.S.G. §2B1.1(b)(1)(M) – loss of at least $65 million but not greater than 150 million - | + 24 |
| U.S.S.G. §2B1.1(b)(9)(C) – substantial financial hardship to at least 5 but not more than 25 victims - | + 4 |
| U.S.S.G. §2B1.1(b)(9)(C) – committing offense after a SEC debarment - | +2 |
| U.S.S.G. §2B1.1(b)(10)(C) - sophisticated means - | +2 |
| U.S.S.G. §3B1.1(b) – managerial role - | +3 |
| Count Five Offense Level = | 42 |

**Count Six – Securities Fraud – GLRD stock scheme**

| | |
|---|---:|
| U.S.S.G. §2B1.1(a)(1) – base offense level - | 7 |
| U.S.S.G. §2B1.1(b)(1)(M) – loss of at least $65 million but not greater than 150 million - | + 24 |
| U.S.S.G. §2B1.1(b)(9)(C) – substantial financial hardship to at least 5 but not more than 25 victims - | + 4 |
| U.S.S.G. §2B1.1(b)(9)(C) – committing offense after a SEC debarment - | +2 |
| U.S.S.G. §2B1.1(b)(10)(C) - sophisticated means - | +2 |
| U.S.S.G. §3B1.1(b) – managerial role - | +3 |
| Count Six Offense Level = | 42 |

**Count Seven – Securities Fraud – HECC stock scheme**

| | |
|---|---:|
| U.S.S.G. §2B1.1(a)(1) – base offense level - | 7 |
| U.S.S.G. §2B1.1(b)(1)(M) – loss of at least $65 million but not greater than 150 million - | + 24 |
| U.S.S.G. §2B1.1(b)(9)(C) – substantial financial hardship to at least 5 but not more than 25 victims - | + 4 |
| U.S.S.G. §2B1.1(b)(9)(C) – committing offense after a SEC debarment - | +2 |
| U.S.S.G. §2B1.1(b)(10)(C) - sophisticated means - | +2 |
| U.S.S.G. §3B1.1(b) – managerial role - | +3 |
| Count Seven Offense Level = | 42 |

**Count Eight – Securities Fraud – ICEIF stock scheme**

| | |
|---|---:|
| U.S.S.G. §2B1.1(a)(1) – base offense level - | 7 |
| U.S.S.G. §2B1.1(b)(1)(M) – loss of at least $65 million but not greater than 150 million - | + 24 |
| U.S.S.G. §2B1.1(b)(9)(C) – substantial financial hardship to at least 5 but not more than 25 victims - | + 4 |
| U.S.S.G. §2B1.1(b)(9)(C) – committing offense after a SEC debarment - | +2 |
| U.S.S.G. §2B1.1(b)(10)(C) - sophisticated means - | +2 |
| U.S.S.G. §3B1.1(b) – managerial role - | +3 |
| Count Eight Offense Level = | 42 |

**Count Nine – Conspiracy to Commit Money Laundering** – 124

| | |
|---|---:|
| U.S.S.G. §2S1.1 – base offense level - | 42 |
| Count Nine Offense Level = | 42 |

**Grouping Analysis**

Section 3D1.1 of the Guidelines sets forth the steps for a grouping analysis. The first step is to group closely related counts as per §3D1.2. The second step is to determine the offense level for each group as per §3D1.3. The last step is to determine the combined offense level as per §3D1.4.

11

As to step one, pursuant to U.S.S.G. §3D1.2(d), all of the foregoing counts belong in one group because the Guidelines for those offenses are determined largely by the total loss. Additional support for that grouping comes from U.S.S.G. §2S1.1, App Note 6., entitled "Grouping of Multiple Counts." That note reads as follows:

> In a case in which the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts shall be grouped pursuant to subsection (c) of §3D1.2 (Groups of Closely-Related Counts).

Section 3D1.2(c) also allows for grouping where one count embodies conduct that is a specific offense characteristic to another count. As such, our alternative argument would be that Counts 1, 2, 3, 5, 6, 7, and 8 are grouped together under §3D1.2(d) as being driven by the total loss amount and then the money laundering joins that group under 3D1.2 as per 2S1.1, App. Note 6.

As to the next step, U.S.S.G. §3D1.3 has two subsections that could apply here. Subsection (a) states that, if grouped pursuant to §3D1.2(a)-(c), the offense level for each group is the highest offense level in that group. Subsection (b) states that, if grouped under 3D1.2(d), use guideline with the aggregate loss. An application of either section results in the offense level for Ron's combined group offenses being 42.

Pursuant to U.S.S.G. §3D1.4, the final grouping step is to take the offense level from the group with highest offense level and increase that level by the number of units. Where there is only one group, however, as there is here, there is no increase in the offense level. Id.

The next step is to subtract three points for acceptance of responsibility, pursuant to U.S.S.G. §3E1.1, which results in Ron's total offense level being 39. With a CHC of III, his sentencing range would be 324 to 405 months imprisonment.

### C. Downward Departure as to Ron's Criminal History Category

Ron also respectfully requests a downward departure as to his criminal history category. Pursuant to U.S.S.G. §4A1.3, such a departure is warranted where "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." "A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period." U.S.S.G. §4A1.3, Cmt. 3; see also U.S. v. Carrasco, 313 F.3d 750, 757 (2d Cir. 2002)("This type of departure is most frequently used when a series of minor offenses, often committed many years before the instant offense, results in a CHC that overstates the seriousness of the defendant's prior record.")

Here, there are mitigating aspects to Ron's criminal history that merit a downward departure. As referenced in Part B of the PSR, Ron's CHC of III results from the addition of one criminal history point for each of his two DUI convictions, a misdemeanor in 2006 and a felony in 2010, and two points for him committing the instant while still on probation from his 2010

12

conviction. While a DUI offense is certainly not a trivial offense, it is relatively minor in comparison to other criminal convictions for which Ron could have received the same criminal history points. Ron's DUI convictions also occurred far enough in the past and involve misconduct of a more local and personal nature that is completely distinct from this instant fraud. As such, we respectfully submit those convictions do not prove a likelihood of recidivism that a sentence in this case is meant to address. Instead, we respectfully submit a CHC of III overstates the seriousness of his criminal history and the likelihood that he will commit other crimes. For those reasons, we respectfully ask the Court to downwardly depart, so that Ron's CHC is II. Combined with a total offense level of 39, Ron's Guideline sentencing range would be 292 to 365 months.

As set forth below, however, we respectfully submit, and Probation agrees, that such a range is still not a useful measure of an appropriate sentence in this case because it drastically overstates the seriousness of the offense and does not account for the factors under 18 U.S.C. §3553 and U.S.S.G. §5H1. In contrast, our requested sentence of no more than five years' imprisonment, three years' supervised release, restitution and forfeiture, no fine, and a special assessment reflects those considerations and, in doing so, serves as a just and fair resolution of this matter. As such, we respectfully ask the Court to adopt that requested sentence.

### VI. A Consideration of 18 U.S.C. § 3553 and U.S.S.G. § 5H1 Support the Sentence Urged Herein

A consideration of the factors set forth in 18 U.S.C. §3553 and U.S.S.G. §5H1 is particularly important in a case, such as this one, where the Guideline sentencing range is so disproportionately harsh. In U.S. v. Adelson, 441 F. Supp. 2d 506, 506 (S.D.N.Y. 2006), Judge Rakoff identified situations "in which calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law." The case before Judge Rakoff at the time involved a defendant who, as an officer of a public company, joined a conspiracy, concocted by others, to materially overstate the company's financial results, thereby artificially inflating the price of its stock. Id. at 507. The Government's market-based theory estimated a loss of over $260 million, resulting in a Guideline sentencing range of life imprisonment, limited only by a combined statutory maximum of 85 years. Id. at p. 507, 510. That range did not change even when the court chose to use an intended loss amount of $50 million. Id. at pp. 510-511. According to the court, "[w]hat this exposed, more broadly, was the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." Id. The court went on to provide a further explanation of the flaws in those calculations:

> What drove the Government's calculation in this case, more than any other single factor, was the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss. As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.

13

Id. at p. 509. Narrowing its analysis even further, the court noted,"[T]he problem is further exacerbated by the fact that the ordinary measure of loss in a criminal securities fraud case is the decline in the price of stock when the fraud is revealed." Id. The court then clarified that the remedy to those infirmities was "to focus its primary attention on the non-guidelines factors set forth in §3553(a) . . . ." Id. at p. 512. Applying that approach, the court imposed upon Mr. Adelson a non-Guideline sentence of 42 months' imprisonment. Id. at p. 507.

Judge Rakoff's criticisms of the Guidelines are well-founded as they are applied to Ron in the instant matter. Again, we do not intend to minimize the severity of Ron's actions or the harm they caused the victims. However, his absurdly high sentencing range of 292 to 365 months (i.e. 24 years and 4 months to 30 years and 5 months) is driven almost entirely by the market-based loss of $114 million. As referenced above, that figure is problematic for two reasons. First, it is a speculative measurement of loss because it represents the total amount each stock was fraudulently inflated multiplied by the number of outstanding shares in those stocks. Because it does not incorporate the prices at which each shareholder bought and sold those stocks, it does not pinpoint the shareholders' actual loss. Upon information and belief, the actual loss of the victims in this case is nearly $100 million less than that market-based calculation. That flaw is further compounded by the disproportionately powerful effect the loss amount has on Ron's Guideline range. Specifically, the market-based calculation adds 24 levels to the calculation. Following Judge Rakoff's cogent reasoning in Adelson, we respectfully submit that one factor, by itself, having such a tremendous impact upon a sentence renders the Guidelines an unreasonable tool in this case. We respectfully submit that Judge Rakoff adopted the correct solution to these problems, which is to impose a non-Guideline sentence that rests heavily upon the factors set forth in 18 U.S.C. §3553 and U.S.S.G. §5H1.

Notably, the Supreme Court's holding in United States v. Booker, 543 U.S. 220, 245-6 (2005) requires sentencing courts to consider, in addition to the Guidelines themselves, the broad directives set forth in 18 U.S.C § 3553(a). That section requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." 18 U.S.C. § 3553(a). Paragraph (2) states such purposes are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts to consider such diverse factors as: the history and characteristics of the defendant; the kinds of sentences available; and the need to avoid unwanted sentencing disparities. 18 U.S.C. § 3553(a)(1)-(7). The Court's holding in Booker also permits this Court to consider those factors listed in U.S.S.G. § 5H1 such as the defendant's lack of guidance as a youth and family ties and responsibilities. We respectfully submit those factors provide support for the sentence requested herein.

As set forth above, Ron endured a tragic childhood. He grew up in poverty without many of the conveniences most people in this country take for granted. His father abandoned him

14

when he was only two years old and his mother subjected him to years of torment and physical abuse and then disowned him at the age of 16, leaving him homeless with nowhere to turn.

He persevered, however, and overcame those bleak circumstances. Through hard work and determination, he went from living on the streets to working as a stockbroker with his own home and stable career. Unfortunately, he never received the proper guidance as a youth and had terrible mentors as young broker in the securities industry. He also failed to address the trauma he suffered as a child, which allowed the pain of those experiences to fester inside him as an adult. With no one there to help him, he survived by numbing his feelings with alcohol and drugs and seeking financial success. His childhood trauma and unhealthy coping techniques skewed his judgment and view of the world, which eventually led to valuing his own monetary gain over the well-being of his customers. He accepts full responsibility for his crimes and the serious harm he caused others and agrees that he must serve a term of imprisonment as a result. As it relates to the length of that term, however, he respectfully asks the Court to consider all of the aspects of his life, including the severe disadvantages and abuse he faced a child and young man, with little to no guidance, as well as the years of substance abuse he endured to ease his pain. We respectfully submit those aspects merit sympathy in their own right and consideration as factors that contributed to his offense conduct. Notably, in the PSR at ¶186 and its sentencing recommendation, the Probation Department also recommended that Ron's "traumatic childhood circumstances and lack of guidance as a youth" were grounds for leniency.

As referenced above, Ron's arrest has finally broken a negative cycle that has plagued him for his entire life. In the wake of his arrest, he has done some serious introspection to discovery the roots of his misconduct, addressed those deeper issues, rededicated himself to his family, and improved his marriage. He has also maintained consistent employment since his arrest and performed well at both jobs. His recent work in the community also speaks volumes and deserves recognition, as he has spent significant time helping disadvantaged youth avoid the same mistakes that he made and offered them hope, encouragement, and support to achieve a better life. We respectfully submit that his post offense rehabilitation lessens his risk of recidivism and demonstrates his redeemable character and capacity for good. In turn, we respectfully submit that any significant term of imprisonment that does not exceed five years is sufficient to deter him from committing a crime in the future. Any sentence greater than five years' imprisonment, however, would be greater than necessary to deter him and other potential white-collar criminals.

In determining a fair sentence for Ron, we respectfully submit that an examination of comparable cases is worthwhile. As referenced above, Judge Rakoff sentenced Stephan Adelson to 43 months imprisonment for his role in a stock inflation conspiracy with a market-based loss of over $260 million. Last year, Judge Vitaliano sentenced Defendant Songkram Roy Sahachaisere to 27 months imprisonment after he was convicted at trial. See Judgment attached as Exhibit K, pp. 1,3. Like Ron, Mr. Sahachaisere participated in a pump and dump scheme as a stock promoter. See Govt memo attached as Exhibit L, pp. 1, 4, 6. The Government believed he was a "promoter and quarterback" [Id. at p. 6] involved in "every facet of the conspiracy," [Id. at p. 4] which "victimized thousands of investors throughout thirty countries across the globe, defrauding them of millions of dollars" [Id. at p. 6].

Defendants Christopher Castaldo and Louis Petrossi recently engaged in a similar scheme to fraudulently inflate the value of one company, ForceField Energy, Inc. ("ForceField"). See

15

Castaldo's sentencing memo and the Government's sentencing memo for Petrossi attached as Exhibits M and N respectively. Like Ron, both Castaldo and Petrossi were stock promoters who solicited investors to purchase falsely inflated stock they owned and later sold for their own illegal profits and the investments' detriment. Id. The market-based loss for their scheme was $27,968,820. Exhibit M, at p. 2. Mr. Castaldo pled guilty and was sentenced to 24 months imprisonment. See Judgment attached as Exhibit O, pp. 1-2. Mr. Petrossi refused to plead guilty, however, and took his case to trial. See Judgment attached as Exhibit P, p. 1. While on bail, he also engaged in an additional fraud in which he solicited investments in a company he claimed would invest in high-profile privately-held startup companies. Exhibit N, at p 4. Instead, Mr. Petrossi used the majority of those funds to pay his personal expenses. Id. He was then convicted at trial and Judge Cogan sentenced him to 44 months imprisonment. See Exhibit P, pp. 1, 3.

Those sentences are consistent with two prior sentences in this case as well. Specifically, this Court previously sentenced Co-Defendant Emin Cohen to 24 months imprisonment and Co-Defendant McArthur Jean to 48 months imprisonment. Both of those defendants participated in the scheme as cold callers and account executives. Emin Cohen received a lesser sentence than McArthur Jean because he had no prior experience in the securities industry and he has extenuating family circumstances.

We acknowledge that there are distinctions between the misconduct of the foregoing defendants and Ron. The actual losses to investors in this case were higher than the losses in Sahachaisere's and Petrossi's cases. Ron's involvement was also more extensive than Adelson's participation and, as compared to Cohen and Jean, he played a more significant role in the scheme and earned more money than both of them. On the other hand, the general nature of the all the defendants' misconduct is the same - that being stock manipulation - and there are numerous other factors, unique to Ron, that weigh in favor of him receiving leniency, including his traumatic childhood, lack of guidance as a youth, post-offense rehabilitation, and extraordinary family circumstances. We respectfully submit that the requested sentence accounts for all the foregoing considerations, and, in doing so, satisfies the need to avoid unwanted sentencing disparities.

As to Ron's family, there is no doubt they will suffer greatly in his absence. As set forth above, he and his wife have two children, ages 13 and 9. Ron has been the family's sole financial provider up until his arrest. His wife has not worked for many years and was only recently able to obtain employment as a teacher's aide, earning $300 a week. Without Ron's income and faced with close to $1 million in debt and monthly expenses of $6,145, his wife will have to sell their family's home, displacing their children, and still may not be able to pay their family's regular bills. See Exhibit H, at p. 2. Ron's absence will also harm his children emotionally, as they are entering their teen years when their father's presence is vital. The requested sentence of no more than five years imprisonment will place an important limit on his family's suffering because it will allow him to return home to support his youngest child during her high school years and his oldest child during his college years. As such, we respectfully submit that the well-being of Ron's family weighs heavily in favor of the requested sentence.

Finally, and significantly, our requested sentence will also allow Ron, now 44 years old, an opportunity to be released at a young enough age where he can gain meaningful employment and work to make restitution to the victims of his offenses. His ability to do so will not only

16

assist the victims but will be a constant reminder, post release, of the harm he caused and his need to continue making amends for it.

### VII.     Conclusion

Based on the above, we respectfully ask the Court to impose a sentence no greater than five years' imprisonment, three years' supervised release, restitution and forfeiture, no fine, and a special assessment. We respectfully submit that such a sentence is sufficient to satisfy the traditional sentencing goals of respect for the law, just punishment, deterrence, and rehabilitation, while also taking into consideration Ron's traumatic childhood, admirable achievements, minimal criminal history, acceptance of responsibility, sincere remorse, post-offense rehabilitation, and extraordinary family circumstances. It is also consistent with the sentences in other comparable cases.

Thank you for your consideration.

Respectfully submitted,

*David Smith*

David Smith

cc:     AUSA Whitman Knapp

17